WILLIAM W. BINGHAM, APPELLANT, V. FRANK A. BROAD-
WELL, APPELLEE.

FILED APRIL 19, 1905. No. 14,014.

1. **Elections: BALLOTS.** A voter who has complied with the statute by obtaining from the election board a ballot indorsed in writing with the names of two members of the board, both of whom are ostensibly and, as he honestly supposes, are really judges, will not be deprived of his vote by the mere fact that one of such names is that of a clerk of the election.

2. **Minor** irregularities by members of an election board, voters and bystanders at a polling place, unaccompanied by fraud or conduct affecting the integrity of the ballot, will not operate to quash the election.

3. **Marking Ballots.** Irregular and defective or unauthorized markings of a ballot, apparently the result of innocent awkwardness, inattention or ignorance, and apparently not intended or made use of for the purpose of subsequent identification, will not justify the rejection of such ballots, if the intent of the voter can be ascertained therefrom.

APPEAL from the district court for Douglas county: GEORGE A. DAY, WILLIS G. SEARS and WILLIAM A. REDICK, JUDGES. *Affirmed.*

*B. G. Burbank* and *Jefferis, Howell & Shotwell,* for appellant.

*Smyth & Smith, contra.*

AMES, C.

This is an appeal from a decision by the district court of a contest of an election to the office of clerk of the district court for Douglas county. The first ground of contest is the claim that in the first precinct of the fifth ward of the city of South Omaha the ballots were indorsed by a judge and clerk of election instead of by two judges. It was held by this court in *Orr v. Bailey,* 59 Neb. 128, and again in *Mauck v. Brown,* 59 Neb. 382, and is generally

held in other jurisdictions, that the statutory requirement of indorsement is mandatory, and the subject is not regarded as open for discussion here, but there is opportunity for inquiry whether it was not substantially obeyed. The evidence is not in conflict in any important respect and is to the following effect: An entire board of election officials, five judges and two clerks, had been regularly appointed, but on the morning of the election one of the judges and one of the clerks failed to appear, and a bystander was called in to take the place, and who did take the place, of the absent judge. At about the same time one Frank Madura, who had been appointed as one of the judges, moved that T. T. O'Connor, who had been appointed as one of the clerks, act as "chairman and judge" of the election. Some one suggested that it would be more proper, or at least sufficient, to elect him simply as chairman; and in some way, it is not quite clear how, the motion was put and adopted, according to the weight of the testimony, in the form in which it was first made. Madura remained with the board, taking an oath of office, performing the functions of clerk and subscribing the returns in that character. O'Connor likewise subscribed the returns as clerk and late in the day took oath of office as such, but he also served throughout the day in the capacity of judge, performing in addition some of the duties of clerk. Another bystander named Mader was called in, evidently to take the place of the absent clerk. He does not appear to have been specially assigned to any duties, but he took an oath of office as judge, and was described as such in the records and returns of the election. O'Connor administered the oath of office to his colleagues, and described himself in the jurat to each certificate as "judge." It is the theory of counsel for the incumbent that the effect of the transaction was such that Madura and O'Connor became transposed, the former becoming clerk and the latter judge, and that Mader, who was called to take the place of the absent clerk, in fact, did so, notwithstanding he was sworn as judge, but that O'Connor performed some or all of his

duties. O'Connor was one of the persons who indorsed his name upon all the ballots, and for this reason alone the contestant asks to have the entire vote of the precinct thrown out.

At the threshold of such a discussion as this the courts are met by two propositions, neither of which can be ignored or evaded. One is the constitutional enactment (sec. 22, art. I) : "All elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise"; and the other, inherent in the idea of representative government, is that the free and uncorrupted will of the voter shall be given effect. In other words, that there shall be a "free ballot and a fair count." These principles pervade and dominate the whole field of inquiry, and affect the decision of every litigated question. All statutes and parts of statutes irreconcilably in conflict with or derogatory of either of them are nugatory, but none is presumed to have been intended so to be. The object of the so-called Australian election laws is not, as some judicial decisions seem to indicate, to limit or obstruct the free exercise of the elective franchise or to restrict the free expression of the will of the voters, but to promote both these things by removing opportunities for imposition, intimidation and corruption; and being remedial in their nature they are to be liberally construed for the accomplishment of the latter end and no other. In consideration of the circumstances the district court decided by Judges Day and Redick, Judge Sears *contra* (the contest being had before the three), that O'Connor was an ostensible and *de facto,* if not a *de jure* judge of the election, and that his signature upon the ballots was regular. We think the ruling was right. It is in evidence by several of the voters that they supposed him to be such, and there was nothing to indicate the contrary to any of them, and there is no evidence that any of them suspected the contrary. To hold otherwise would be to put by judicial construction an insuperable obstacle between the voters and the polls. It would be to require the electors at their peril

to make inquiry, and decide correctly, and without deliberation, a question upon which three district judges were unable to agree after hearing elaborate arguments at the end of forty consecutive days of investigation, and about which the members of this court may finally differ. If the statute attempts the imposition of such an obligation it is unquestionably void. We do not think that it does so. Section 146, chapter 26, Compiled Statutes, 1903 (Ann. St. 5784), prescribes comprehensively and in detail the conduct of the voter while at the polling place. Among other regulations is the following: "He shall receive from a judge of the election board a ballot on the back of which two judges of the board shall first write their names in ink. * * * The voter shall then fold his ballot so as to conceal the names and marks thereon, and to expose the names of the judges of the election board upon the back thereof, and shall without delay" deliver the same to a judge of the election, who shall verify the signatures upon the back thereof and deposit it in the ballot box. The voters strictly and literally complied with this section. They verified their ballots and the indorsements upon them as well as they were able to do, "at a glance," to use the phrase of former decisions of this and other courts, and having folded them as directed, handed them to a sworn official for further verification and deposit. If after all this they can be deprived of their votes because one member of the election board, whose name is indorsed on the ballots, was a clerk instead of a judge, the validity and result of elections would in all cases be in the discretion of the boards.

The contestant demands that the whole vote of the second precinct of the fourth ward in South Omaha shall be thrown out because of the following facts found by the court, which do not appear to be in dispute: During the election hours some of the election officials were under the influence of liquor, but not sufficiently so to incapacitate them from the performance of their duties, but some of them were so incapacitated during the canvass. Two of

the election board were absent at one time during the election hours. There was whiskey in a room adjacent to and opening off from the polling place. Voters were assisted by election officials without having the oath of disability administered to them, and ballots prepared by such assistance were deposited and counted. Election officers did not make any effort to prevent bystanders from going behind the guard-rail, and a police officer on two occasions removed intruders from that place. Strangers assisted the judges and clerks of election in the counting and canvass of the votes after the polls were closed, and it was found generally, without other specification, that some of the election officers were guilty of malconduct, but that their incapacitation arose in part from misunderstanding of official duty; and finally, "The court finds that the ballots deposited with the county clerk of Douglas county, Nebraska, by the election officers of said second precinct of the fourth ward in the city of South Omaha were the identical ballots cast at said election by the persons voting at said election, and that said ballots, as returned by said judges of election and deposited with the county clerk of said county, were, when deposited with said county clerk, in the same condition in all respects as when voted by the several electors and deposited in the ballot box at and during said election." The court further finds there should be counted for the contestant, William W. Bingham, and for the incumbent, Frank A. Broadwell, in said second precinct of the fourth ward of the city of South Omaha, the number of votes as provided in the stipulation of parties filed in this cause, to wit: contestant, Wm. W. Bingham 62, incumbent, Frank A. Broadwell, 190."

The assisted ballots above mentioned were three only in number, and by stipulation were deducted from the total cast for the incumbent, and therefore need not be further considered.

The general finding that some of the election officers were guilty of malconduct, we think too vague and indefinite to effect so grave a result as to defeat a popular

42

election. Certainly not every offense of that kind, however
trivial, can have such serious consequences. Concerning
the rules violated by the conduct specified, it is insisted
that they, like the requirement of the indorsement of bal-
lots, are mandatory, and doubtless in a sense they are so,
because breach of them or of some of them is punishable as
a misdemeanor, but the acts particularized are not such as
the voters procured to be done or in which they partici-
pated, nor to which, so far as appears, they consented, nor
which it was within their power to prevent. There is no
pretense that the officers of the election, or any one else,
were or was guilty of actual fraud or corruption, or in-
fluenced in anything that was done by any fraudulent or
corrupt motive, or that the conduct complained of in any-
wise affected the result or the accuracy of its ascertain-
ment. We think the considerations already advanced justi-
fied the trial court in overruling the contestant's objection,
which they did. If elections could be defeated for such
irregularities, committed under such circumstances, it
would hardly be possible to hold one that would be valid.

In the neighborhood of 150 ballots were objected to, some
by one party and some by the other, because of irregular
and defective marking and alleged marks for identification.
They were annexed to the bill of exceptions and returned
with it into this court. For the examination and disposi-
tion of these ballots the court adopted the following rules:
"1st. Where the ballot was indorsed upon the back by
the signature of but one judge, the court refused to count
such ballots. 2d. Where from the appearance of the ballot
it was unable to determine the elector's choice, or where
it was evident that the voter had intended to destroy the
ballot, then the court refused to count the same for either
candidate. 3d. Where the name of the candidate as printed
upon the ballot had been erased and another name written
in, if the name thus written in was already printed upon
the ballot, then the ballot was excluded. 4th. Where the
voter made no effort to make a (X), but merely made a
straight line (I), or circle (O), such ballot was excluded.

5th. Where names were written upon the back of the ballot, or where the voter made improper markings on the back of the ballot, such ballot was excluded. 6th. If the voter wrote words on the face of the ballot not necessary or proper to express his choice, having no relation whatever to a cross within the circle, such ballots were rejected."

It will be observed that all the foregoing are rules of exclusion, so that ballots not described and classified by them were treated as valid and counted. In our opinion they are, in their general operation and effect, to be commended, but in some respects, to which we have called attention elsewhere, we think they are too rigidly exclusive, and may have operated to deprive some voters of honestly cast ballots, the intent of which is not in doubt. Thus modified by ourselves we are of opinion that the rules are at least as strict and critical as would have been justifiable by the statute and the former decisions of this court. Section 151, chapter 26, Compiled Statutes, 1903 (Ann. St. 5789), provides: "When a ballot is sufficiently plain to gather therefrom a part of the voter's intention, that it shall be the duty of the judges of election to count such part." In harmony with this statute this court held in *State v. Russell*, 34 Neb. 116:

"It is not every mark by means of which a ballot might subsequently be identified which is a violation of the statute. The mark prohibited by law is such a one, whether letters, figures, or characters, as shows an intention on the part of the voter to distinguish his particular ballot from others of its class. * * * The fact that a number of ballots are, without any evidence of a fraudulent intention on the part of the voters, distinguishable from others cast at the same polling place, as, for instance, marked with a pencil or with ink of a different color, does not bring them within either the letter or spirit of the statute."

This opinion was expressly approved and reaffirmed in *Mauck v. Brown*, 59 Neb. 382, in the following language:

"It is true the manner of marking the ballot might serve to identify it; but with the policy of the law as declared in the section, wherein it is stated that when a ballot is sufficiently plain to gather therefrom a part of the voter's intention it shall be counted, and the construction given to the law by this court in *State v. Russell*, 34 Neb. 118, and *Spurgin v. Thompson*, 37 Neb. 39, there was an indication here of the voter's intention which was entitled to recognition, and it was proper to count the vote."

The district judges in this case considered that, "Where from the nature of the marks the voter's intention was plain, and it was evident that the marks of which complaint were made were not made for the purpose of identifying the ballot, then the vote should be counted." And so, in illustration of the rule thus announced and reiterated in *State v. Russell*, and *Mauck v. Brown, supra*, this court counted a ballot in the latter case upon which the cross-mark opposite the candidate's name was made on the left side of the ballot, instead of on the right side in the space reserved for that purpose, the opinion saying: "It seems clear that it was the intention to vote for the particular candidate, and therefore the ballot should be counted." These decisions are the more significant because at the time of their rendition there was a statutory provision in existence, shortly afterwards repealed, which enacted: "Do not make any mark upon the ballot save as above directed or the ballot will not be counted." The legislature was, perhaps, conscious of what the court does not seem clearly to have apprehended, that so rigid a regulation was a practical obstruction to the voter in violation of the constitution. Perhaps the matter is as concisely and comprehensively summed up, as is done elsewhere, in *Orr v. Fawcett*, 17 Wash. 188. The statute in that state provides: "The voting shall be by ballot. No ballot shall bear any impression, device, color or thing designed to distinguish such ballot from other legal ballots, or whereby the same may be known or distinguished." In considering this statute the supreme court say:

"Whatever may be said of the Australian system, a glance at the ballot at a general election is sufficient to convince anyone that it is not an easy thing for a person of common understanding to intelligently and without great chance of mistake express his wish. A person accustomed more to the plow or the plane than to the pen would almost certainly be confused when he was ushered into a dark booth with this ticket, with its multifarious provisions and its immense dimensions spread out before him. Indeed, it is probable that the most careful business man who has been accustomed to perusing and executing documents of a business character, will have grave misgivings as to the correctness of his vote when he leaves the booth. And to hold that every misconception of the printed directions of the law would deprive an elector of his vote, would certainly be a holding not within the contemplation of the legislature which passed the statute we have just mentioned, for it has been careful to provide that when a ballot is sufficiently plain to gather therefrom a part of the voter's intention it shall be the duty of the judges of election to count such part."

And in determining what ballots should be counted the court lays down this rule, in the syllabus:

"Ballots are not invalidated by failure to strictly comply with the statutory directions for marking them, under the liberal rule for arriving at the voter's intention allowed by our statutes, but when the markings are evidently intended for the purpose of expressing the voter's intention, the ballots should be counted. Under this rule, ballots are entitled to be counted although having a X to the left, instead of the right, of the name of the candidate voted for; when having a double XX opposite a name; when having a X opposite names of candidates of one party and lines drawn through the names of opposing candidates; when having a X opposite one candidate and an obliterated X opposite the opposing candidate; when having pencil marks run through lines of amendments submitted, or a X over all of them, or the words 'no,' 'yes,' 'against,' 'for,' written opposite."

In the body of the opinion the court say:

"It is also true, however, that in the absence of constitutional inhibition all statutes tending to limit the citizen in the exercise of the right of suffrage should be liberally construed in his favor. If his ballot is rejected, it must come within the letter of the prohibition, and when the statute specifically declares under what conditions ballots shall be rejected, courts should not enlarge these conditions or make other or different conditions from those expressed in the statute grounds for rejecting the ballots. It will be noted that our statute provides only one condition under which a ballot should be rejected, viz., a ballot from which it is impossible to determine the elector's choice, and, after all, this should and must be the intention of the legislature. The important thing is to determine the intention of the voter and to give it effect." To the same effect are *Howser v. Pepper*, 8 N. Dak. 484; *Attorney General v. Glaser*, 102 Mich. 405; *State v. Sadler*, 25 Nev. 131; *Tandy v. Lavery*, 194 Ill. 372.

The principles announced by the foregoing decisions are sustained by the nearly, if not quite, unanimous voice of the authorities, and to our minds are manifestly correct. No means could be devised that would be better adapted to hinder and impede the electors than a scheme for rejecting ballots bearing irregular marks evidently innocently made, as the result of ignorance, inattention or awkwardness, and the quashing of elections because of minor irregularities of procedure and conduct by election officers and bystanders, that could be prevented only by a discipline more strict and severe than is usually maintained in military parades. Such a system would be admirably calculated to facilitate secret frauds and corruption of a kind most difficult to detect, and to commit the results of election almost solely to the discretion of election boards and inspectors, who, without danger of observation, could admit of trivial deviations from prescribed rules whenever it should suit their purposes so to do, and on other occasions could avail of them to defeat the

elections.   Under such circumstances the presence of the electors at the polls would be of as little importance as that of negroes at similar places in a southern "black belt."

In no case is it more imperative than in election contests that the maxim should be applied that the burden of proving fraud is upon him who alleges it.   It ought never to be inferred from slight irregularities, unconnected with incriminating circumstances, nor should it be held as established by mere suspicions, often having no higher origin than partizan bias and political prejudices.

In line with these principles we have recounted the ballots which have been sent up with the bill of exceptions.   In the main, the district court in its count applied the principles and rules which it had adopted for the counting of these ballots.   In a number of instances, however, we have counted ballots which were rejected by the district court.   For instance, where a ballot was marked in the proper space with what has been designated as an "H" mark, or a wheel, or star-like mark, or a figure "X," we have considered that the addition of one or more lines to the cross has not defeated the voter's intention. We have also counted a ballot rejected by the district court where the voter had made a mark opposite the party name at the head of the column, and had obliterated the same by erasing it or by covering it with solid pencil marks, circular in form, and had also indicated his intention by properly placing a cross in the space opposite the name of a candidate for the office of the clerk of the district court.   We have also counted several ballots where marks were made in each of the circles opposite the name of the political party at the top of the ballot, thus rendering it impossible to tell which of the respective political parties the voters desired to have his ballot counted for as a straight ticket, but the voter at the same time making an appropriate mark opposite the name of a candidate for clerk of the district court, thus clearly indicating his intention as to such officer.   A number of ballots have also

been counted by us where names were apparently written by the voter in the space provided for candidates for road overseer, or justice of the peace, and a cross made by the voter opposite thereto; and we have counted ballots in which the voter properly voted for clerk of the district court, but made a mistake in marking opposite the name of some other candidate and endeavored to obliterate the same by filling the square with solid pencil marks.

In general it may be said that, unless we were satisfied from the appearance of the ballot that any irregular or unauthorized mark appearing thereon was placed there as a distinguishing mark, we counted the same. Where words were written upon the face or back of the ballot, other than names of candidates or election officers, the ballot was rejected. Marks made by awkwardness or inadvertence, or by mistake of the voter, were not seized upon by us as instruments of disfranchisement. In some cases where the voter had drawn a line through the name of persons for whom he did not desire to vote, but in other respects his ballot was proper, it was not rejected. It will be seen that we have modified the strict rule of *Mauck v. Brown, supra,* in the direction of giving effect to the voter's intention, even if evidenced by other markings than a mathematically exact cross, and have refused to defeat it by calling every accidental or awkwardly or ignorantly made mark or blot a distinguishing or identifying mark.

By this method of counting, both candidates received accessions to the total number of votes which had previously been counted for them—Mr. Broadwell gaining 13 votes and Mr. Bingham 14 votes. In addition to these ballots we have added to the vote for Mr. Bingham 21 ballots and to the vote for Mr. Broadwell 12 ballots which were rejected by the district court in the eighth precinct of the third ward of Omaha for the reason that the names appearing upon the back thereof were of one judge and one clerk and not of two judges. With these additions the total vote for Broadwell is 8,979, and the total vote for

Bingham is 8,968, leaving Mr. Broadwell a majority of eleven votes.

Whatever may be said of individuals and of special interests, it will not do to presume that the mass of the voters are fraudulent or corrupt. When, if ever, the time shall come that such a presumption shall be just, the only means, if any, of the preservation of society will be the abandonment of the experiment of free government. In the present instance no specific charge or pretense of corruption or of fraudulent intent is made, but we are asked to infer such an offense from apparently accidental or awkward or ignorant markings or mutilations of some 150 ballots selected from some two score precincts, a part of them in the cities, and a part in the country, the number selected from each varying from one to six or eight, and the average being about four or five, or else we are expected to hold them constructively fraudulent. We doubt if the doctrine of constructive fraud is applicable to such cases, but if it were so, the presumption would be rebutted by the circumstances. The very fact that the ballots were collected from such scattered sources in such small numbers precludes the idea of combination or design, or that they were cast with other than an honest intent.

We recommend therefore that the judgment of the district court be affirmed.

LETTON and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the judgment of the district court be

AFFIRMED.